Good morning, may it please the court, Jameisa Drake on behalf of Russell Rose. If the court pleases I'd like to reserve three minutes of rebuttal. Under the cover of darkness a team of surveillance agents low crawled onto Rose's property, surrounded his home, took up position and waited. Meanwhile one agent laid down on Rose's front steps and from that confirmed that Rose and Ford were inside the residence with stacks of money. At that precise moment agents realized that at least some portion of the Ford-Rose drug deal was underway inside. And as the government concedes on page 38 of its brief, without that information Quinn could not successfully have obtained a warrant to search the house. Rose, Ford, and the money together inside the home were the missing piece of the puzzle. The problem of course is that surveillance officers conducted an unlawful search inside the curtilage of Rose's home and the government makes no argument otherwise. Paragraph 58 of Quinn's affidavit which details at length all that the agents observed contaminated the warrant. The warrant is a direct fruit of the officer's antecedent illegality. The independent source exception does not apply. I think it may be helpful for this court to narrow the issue that is The government concedes that without the information obtained during that search there was insufficient probable cause to obtain a warrant. That your honors is the ballgame. That is the preceding illegality and that is the first prong of the analysis under Murray. That alone is cause to remand this case. Of course without even reaching the question about the warrant, the jurors heard nearly two hours worth of testimony from Detective Cahoon where he detailed for them all the observations he made lying down on the front steps. Counsel, what is it precisely you say the government conceded on page 38 of its brief? It appears it's the very last sentence on that page. They agreed that they could not have sought a warrant until they determined that Rose and Ford were together at Rose's house. That's correct, your honor. And didn't they determine that Rose and Ford were together at the house before what you call the low crawl? The information that they had before they low crawled onto the property is that there were vehicles attributed to both men parked outside the residence. That establishes probable cause to believe that both men may be inside. Maybe. But the government we don't know necessarily would have sought a warrant at that point. In fact the history of this investigation suggests that without any contraband present the government would have retreated. What's the standard of review for that question? Whether the government would have sought the warrant based on seeing the vehicles and reaching a conclusion that they might be in there together? What is our standard of review for that determination? Well that is the Murray analysis and so it's the typical standard of review that applies to Fourth Amendment. It's accepting any factual findings made by the district court as true. Is that a factual finding? What the officers might have done or is that an ultimate finding? Under the first prong of Murray the subjective intent we have no factual finding by the district court. The absence of a factual finding if this court is unwilling to accept the testimony that was in the record is also cause to remand for that limited issue. Interestingly the one finding that we do have from the district court about the officer's subjective intent is that they approached the home and knocked on the door in bad faith. That means that the officers were not seeking a true consensual encounter when they approached the residents. This is in no way a situation where the knock on the door could somehow have insulated or the curtilage violation is what prompted the officers to reveal themselves. Are you saying there is no evidence alleged or no statements alleged in the affidavit that would support the search warrant without looking under the door? Yes your honor. At best it was at least as likely that the drug deal took place as part of the car to car transaction that occurred earlier in the evening. So if we read the affidavit. But that's not the standard likelihood. It's just probable cause which is less than at least as likely. Am I wrong about that? The court has never actually defined probable cause but it's widely understood as meaning more likely than not. When you say it's at least as likely it took place in the car to car transaction. What's that scenario? What happened there? What was the exchange? Sure. So if we take the affidavit in its entirety. Just the car to car. What's your theory? Is that they exchanged cash for drugs from car to car? The officers observed some sort of transaction between Ford and females in an Acura SUV. They don't know what they saw. So your theory is that could have been the transaction going down there. That's not just my theory. That was the government's theory. That was Cahoon's testimony at trial. But then Ford leaves there and goes to Rose's house. That's correct. And so of course that doesn't answer any questions. That gives rise to the $64,000 question in this case. What is going on inside that home? There are two scenarios I understand it. One is the deals going down at the house. The other you say the alternatives, the deal went down car to car. If it was the latter and one of the people then left the car to car transaction and went directly to the house without stopping anywhere, wouldn't that suggest that one of the things exchanged car to car is now at the house? No, Your Honor. And there's actually no suggestion to that effect inside, within the four corners of the warrant. The reason the police low crawled onto the property and conducted further investigation is because they didn't know what was going on inside. They didn't know if there was anything in the house other than these two men. And the only fair reading of the affidavit from beginning to end is Rose saying the deal will involve a truck. It will involve a girl. I'm sorry. I have to interrupt you because there's a intercepted phone call that leaves, that sets some background to this. During the intercept call, Ford asked Rose, this is before the exchange, yo, what's happening, Papa? Rose replied, trying to get things in order now. Ford replied, oh, okay, just hit me. Ford, I mean, I assume that some of his language is not unfamiliar with what it means. Ford also asked Rose, what kind of time frame are you looking for? Rose advised Rose, I'm trying to get this girl right now so I'm just, once I get a hold of her, I will hit you and give you the exact location. That's after, after that's when the exchange takes place between cars and after that they go to the house. No, okay, so Rose has a history, which is indicated in paragraph 66 of the warrant, of keeping drugs away from his house. Quinn testifies, or Quinn embodies in his search warrant application that he has concerns about searching Rose's home. So what we're seeing in that paragraph is Rose saying, I'm going to get a girl and I will tell you later what the exact location will be. What happens is that Ford, who's based in Boston, heads towards Randolph, which is where Rose is located, gets off at the first exit, pulls into a gas station at an odd angle, and then is approached by a female in an SUV. Recall that earlier Ford indicates the deal will take place involving a truck. Agents see something that they don't understand. They believe that could be where the deal is taking place. So they seize the car. They do an initial search, found nothing, and then believe they have probable cause to impound it to search it further. They just did a cursory search. Detective Cahoon's testimony confirms that they did not know what was going on with that car-to-car transaction, which is why they conduct further investigation at Rose's home. They low-crawl onto the property, see and this is really the crucial fact, they see contraband, and it's at that point that they are willing to reveal themselves and conclude what up to that point had been a two-year investigation. They have a history, the police have a history of having sufficient probable cause to arrest, but backing away and not making arrest unless there's actually contraband in the hands of the person that they are seeking to apprehend. Unless the court has further questions? Thank you. Thank you. Ms. Capiccio? Thank you. May it please the Court, my name is Rosemary Capiccio and I represent Mr. Fry. I'm asking this Court to do two things with Mr. Fry's conviction. First, reverse his conviction for the errors alleged in the brief and second, at a minimum, to remand it for resentencing for an Allene error that occurred during the sentencing hearing. I'd like to address the Allene error first if I could. In this case, it's clear that Allene says any fact that is an element of the offense that must be pled and proved to the jury beyond a reasonable doubt. In this case, we have a very unique situation. We have a situation where there was an objection to drug quantity and specifically as to the fact that it wasn't proved in terms of the quantity. And in this case, we have a judge making a finding on the record that as a result of the drug quantity that he found in excess of the jury's verdict, he found a mandatory minimum, specifically. Are we reviewing for plain error here? Isn't that our standard? Was there preservation of this Allene issue? I believe there was. The government is taking the position that there wasn't. If you look at page 6 of the sentencing memo in this case, the objection was to quantity not tested and proven in this case. That was the objection. But as I read that, it looks like what your client's trial counsel was saying was that it hadn't yet been proven, so the sentencing judge needed to hold an evidentiary hearing was his argument. Actually, I was the trial attorney. So I was asking for an evidentiary hearing. Before the judge. Before the judge, absolutely. But in addition, I was claiming that it wasn't pled approved at that point. And that's why I said, as far as the page 6 of my memo was concerned, that we objected to quantity not tested and proven. Right. But Allene isn't a question of whether it's pled or approved. Allene is that the jury has to find it. That's the Allene error, right? Exactly. And so if it hasn't been pled and proven, then the jury couldn't have found it. But then why are you arguing that the judge needs to hold an evidentiary hearing? It seems to me you're objecting to there isn't yet somebody who's found it, and the judge needs to do it, as opposed to saying to the judge, game's over, jury didn't find it. Right. And certainly Allene wasn't on the books at the time that we made this determination. There was nothing from which to argue that the game was over at that point. What I was trying to preserve when I made that objection is that the jury should have found the drug quantity in this case. And the suggestion by the government that that's not what it is, I was there and I know what I did, and I can tell the court that that was the intention. But here's the reason that it's different from the other Allene cases that this court has handled. We have the judge in this case expressly stating that as a result of drug quantity that he found, that Fry was subject to a 20-year mandatory minimum. We have a concession by the government that that was erroneous as far as the judge was concerned. That the quantity in the jury verdict was 100 grams of heroin, 500 grams of cocaine. The quantity that the judge found in this case was 923 grams of heroin and 14 kilos of cocaine. But then you have to go on, don't you, to consider the additional statements made by the judge that he made an express reference to the guidelines, I believe, saying that they were slightly inflated, but he felt that a long sentence was appropriate and gave 25 years, which is a long way from the 20-year minimum. So just how do you deal with that? Well, I think what the judge did in this case is, I think it's unique, because he said specifically that he wasn't going to sentence Mr. Fry under a career offender. And the reason for that is because he thought the career offender was too onerous. And so the career offender would have subjected him to 360 months to life. In this case, he was looking at the minimum mandatory 20. If he's wrong about the minimum mandatory... How do we know that's what he was looking at? Because that's what he said. He said the drug quantity... He said that he was subject to... Subjected to... But he didn't sentence him to anything near 20 years. Well, he sentenced him to 20% above 20 years. 25 years. Essentially, he added 20% to the 20 years, the mandatory minimum. So clearly, he wasn't looking to sentence Mr. Fry to a mandatory minimum. He sentenced him below what the career offender guidelines, which is what the discussion was about. I mean, maybe we're quibbling. You're right. He did mention the mandatory minimums. There was no reason to ignore them. But I'm having trouble seeing how he pegged the sentence to that in any way. Because he thought the starting point was 20. What if he's wrong and the starting point is 10? And what if he only intended to give my client 20% more than the mandatory minimum? Which is ultimately what he imposed when he imposed the 25-year sentence. And so his intention was, he's not entitled to the mandatory minimum. He's worse than the mandatory minimum. So let's do something in addition to the mandatory minimum. And what he did was he added 20% to the mandatory minimum. And if he's wrong in calculating that drug quantity that triggers the mandatory minimum, and the mandatory minimum was 10, then we're only talking about 12 years. The question really is whether the record supports your initial premise that that was the starting point. To me, that's the question. And I think it's clear from what the judge says in the concession of the government. There's no other way to look at it other than the judge believed erroneously that the mandatory minimum was 20 years in this case. And that was his starting point. The mandatory minimum was his starting point. Judge, aren't you in effect saying that the mandatory minimum always sets the scale? Absolutely. And so unless there's something plain in the record saying the judge ignored it, that we should always assume that it affected the sentence, no matter how much higher the sentence is than the minimum? Absolutely, because the minimum is where the starting point is. And that's where the judge thought he had to start when he indicated the mandatory minimum for Mr. Frey was 20 years. And so yes, he said Mr. Frey was a bad person, Mr. Frey had a bad record. He said all of those things. But in saying that, he said he wasn't bad enough to get a career offender and be sentenced to 360 months to life. And so he clearly wasn't looking to max out Mr. Frey. And what he did was he added 20% to what he believed the mandatory minimum was. And my suggestion is he was wrong about the mandatory minimum. That was his starting point. We have no way of knowing what he would have done if the mandatory minimum was 10. He could have given him a 12-year sentence at that point. That would have been 20% more than what the mandatory minimum was. And so we don't have a way of understanding that because we only have the judge's determination on the record, which is very clear that he found drug quantity in excess of what the jury's verdict was and he set a mandatory minimum of 20 years. Counsel, isn't your statement that you don't know what he would have done, isn't that a problem for you if we are on plain error review? I think we can determine from the record that his 20% is what he was intending to do. 20% above the mandatory minimum. I didn't see a reference to him using that formula. He didn't. But I think if you take the fact that he did not sentence Mr. Frey as a career offender and he thought that was too onerous, that was 360 months to life, that was too onerous. We know that was too far afield for him. And we know that his starting point was 20 years. He added 20% to that 20 years. That's the sentence that Mr. Frey got. And if that's what we have on the record and that's all we have on the record, I think we can make the assumption if the mandatory minimum was 10, he would have added 20% to the 10 and Mr. Frey would have gotten 12 years. A career offender, what does that translate into in terms of years? 360 months to life is 30 years. 30 years. So it's five years below that. Five years below, yes. Couldn't you equally say the judge's formula was that he was setting it at 5-6 of the max? I'm sorry, say that again, Your Honor. Couldn't you say the judge's formula was 5-6 of the 30? I think that when he says that the mandatory minimum is too onerous, I think that gets set aside. He's not looking at the mandatory minimum once he tells us it's too onerous and it's not fair. And so now we're looking at the mandatory minimum plus whatever the judge determines is the appropriate sentence in addition to the mandatory minimum because he believed that Frey wasn't entitled to the mandatory, he was entitled to something more. And the second issue I'd like to address because I know I'm running out of time is this issue regarding the prior conviction. Mr. Frey was, the government used a prior conviction for introducing contraband into an institution to suggest that that was a prior drug offense. We objected. Clearly on the record we objected in terms of what was going on. Our argument then is the same as our argument now, which is contraband in an institution can be anything. It can be alcohol. It can be. It was alcohol, wasn't it? In this case? In this case it wasn't, Judge. In this case it was marijuana. But he has a problem with that. All the government introduced to prove that prior conviction was the judgment. The judgment contains both a statute that criminalizes drug and non-drug offenses in this case. And if it criminalizes drug and non-drug offenses, the onus is on the government to prove that it was actually a drug offense in this case. All they did to prove that was to introduce the judgment. They did say at sentencing that the transcript itself mentioned the word marijuana, but they never actually entered the plea transcript into the pleadings for the judge's consideration. There was mention of marijuana in the PSR as far as the prior conviction is concerned, but the onus was on the government here. The government was looking to increase the sentence based on a prior drug conviction. They had the obligation to introduce the evidence sustaining the fact that the conviction was based on a drug, not a non-drug offense. And my suggestion in the brief is that because the statute criminalizes drug and non-drug offenses the same, unless it's clear from the judgment that it's a marijuana conviction, that it shouldn't be used as a prior conviction in terms of a drug offense. That was the argument that I made to the court. That was the argument that was rejected by the court. The government is taking the position that it simply doesn't matter because it was contained in the PSR as far as the drug offense is concerned. I think it's a very unique situation because contraband is defined in the way that it's defined as far as the statute is concerned. And I believe if you look at the statute it's going to say contraband could be currency, contraband could be alcohol, contraband could be firearms in this case. And that's why the case should be resentencing in that case. The third issue that I'm going to try to get to very quickly is the overview testimony in this case. I'd like to just present two quick analyses of the overview testimony from Agent Quinn. What happened was Agent Quinn testified before the two cooperators in this case and he set up their testimony to bolster their credibility. And what he did, I'm asking the court to look at Volume 3 of Agent Quinn's testimony. And specifically Volume 3, page 33, where there was a telephone conversation about Mr. Pena saying that he had hit the megabucks. And Agent Quinn interpreted that for the jury to mean that he was commenting on the quality of the drugs that he had just ingested. Now, Mr. Pena hadn't testified at that point. Megabucks is not a drug term that he can interpret in some way. He was interpreting what Mr. Pena was saying on the telephone before Mr. Pena testified as overview testimony. Was there an objection to that? Yes, absolutely. There was an objection to every single bit of this. There's another example that I want to get to because I only have 53 seconds left, and that is on Volume 3, page 37, when there's a second conversation, also over my objection, where it says game over 102 days. And what Agent Quinn said that meant, that was another conversation with a cooperating witness, and Agent Quinn said that meant that there was a sale of 100 grams of heroin sold in two days. Now, there was no testimony about 100 grams of heroin sold in two days. Clearly overview testimony in this case. Clearly testimony that was setting up the two informants who had a lot to lose in terms of cross-examination. They were using their case agent to set their case up in an overview fashion and to explain these recorded conversations before those individuals ever got to the stand to talk about those recorded conversations, which bolstered their credibility and should require a reversal of Mr. Fry's conviction. Based on the order of the presentation of the? Not just the order. The fact that they presented their case through their case agent before they presented any witnesses. But when you say before, you're suggesting that if they put the witnesses on first, it would have been okay. I don't think it would have been in this case. Okay, so let's put the before to one side. I think the fact that they used their case agent to bolster their own witnesses, to have him interpret not just drug language. We're not talking about whether or not a half a rope means a half a rope of heroin. We're talking about specific, very factual specific language in these recorded conversations that they used the agent to interpret before they ever had any testimony from anyone else. Even if they did have testimony from somebody else, the agent can't comment on what that means because he has no personal knowledge. He only knows it because he talked to other people about it. And the best evidence is those other people. That's who the government should have presented in this case, and they didn't. And that's why the conviction should be reversed. And I'm out of time, so. Thank you. Thank you. Ms. Heller, good morning. Good morning. May it please the Court, I'm Kirby Heller for the government. Let me start with the question of the search. The government did not concede in its brief and does not concede here that it couldn't have gotten a warrant without the observations of the money. And it also doesn't concede that the search under the exigent circumstances exception was illegal. Just to the latter point briefly, of course, Rose did not renew his suppression motion after Cahoon's testimony. And so the question of whether the district court, erred by finding that there was an exigent circumstances entry into the house, is just based on the information that was before the court, and that was proper. In addition, we've made the point throughout that the observations of the money were not important. Even if they hadn't seen the money, and we don't, as I said, we don't concede that that was improper, the important point for determining whether the independent source doctrine should apply and whether the record supports a finding that these agents or officers would have gotten a warrant before they made any observations in the house or through the window, was when they decided to do the knock and talk. And that decision was made before they entered the curtilage. That is based on Cahoon's testimony. Once they're going to do a knock and talk, it can certainly be inferred that they are announcing their presence to these suspects. They know, based on all the information that's in this search warrant affidavit, that there is certainly probable cause, and I would submit more than probable cause, to believe that there are drugs, money, and cocaine and marijuana inside this house. And once they alerted these suspects to their presence and to the probability that these suspects would know that there have been surveillance and wiretaps, they were not going to walk away from that evidence. Let me ask you a procedural point that's confusing me. Under the first melee prong, the subjective what would they have done prong, I believe our precedent establishes that that's a finding of fact that the district court makes and that we then review for clear error. That's correct, Your Honor. And here, the only finding of fact we have on that is a brief statement by the district court judge that the independent source doctrine would also save the search because of what they saw in the house. So we don't have any finding. I can't find in the record. Maybe you could point us to one if there is. But we don't have in the finding, in the record, a finding that Quinn would have saw a warrant even if he had not peeked in the house. I don't think we have an explicit finding. So how do we know here? Don't we need to remand it so we can get a finding that we can then review subject to clear error? I don't believe you have to remand it for two reasons, Your Honor. First, I do believe there's an implicit finding. I don't read the district court's order as stating that once they saw the money, they were going to get the warrant. In fact, what the court says, and he does use the word bad faith, basically saying these officers were going to go in the house no matter what they saw. And I think in a sense that's true. Having committed, it goes back to my previous point, having committed to do this knock and talk, they weren't going to walk away. Let me stay with you in terms of what the judge said. As I understand it, page 45 of the Addendum, what the judge says, is an alternative ground for denying his motion to suppress the independent source doctrine arose when the officers looked in the window to Rose's residence. And so he's saying that the alternative source was what they saw when they peeked in the window. Well, again, there are the two prongs of the independent source. But you agree that can't be the independent source, what they saw looking in the window. If that were the only, if they didn't make the decision until they looked through the window, and in addition that was an illegal observation, then that would be the case. I don't think that's what's true here. Where does the judge say that the independent source doctrine would apply to both the facts and the state of mind prior to looking in through the window? Well, I think the fact that the district court is relying on the independent source, and the district court also knows that there are these two prongs. So if exigent circumstances doesn't work, then we have this other argument. If exigent circumstances doesn't work, then we don't know, then they don't know about the money that they see inside the house. Now, the reason, of course, the district court had no information about the, he had no information about how Cahoon saw the money. That wasn't presented to him. And so that finding, Your Honor, is right. He didn't explicitly address whether, well, even if that weren't illegal, they would have gotten a warrant anyway. But our position is that the record does support the fact that they would have gotten the warrant anyway. So what I hear you saying is you think the record is such that the district court could have found that even without looking in the window, they would have got a warrant and it would have been valid. That's correct. But if the district court found that it doesn't matter that they saw the money inside, it really doesn't matter that they saw the money from the outside. None of that matters, of course, because they knew that the money was there to begin with. And this gets back to the issue of probable cause and what the affidavit shows. The affidavit shows that, of course, they knew there was a drug deal that was going on, a lot of intercepted conversations. At some point after Rose and Fry are talking about getting in on the deal together, Rose and Fry meet at CVS. Then there are some other discussions which certainly establish probable cause and more so that there was an exchange of money, that Fry gave Rose money. And surveillance agents follow Rose directly home. There's no deal in the car at that point. Rose goes home and he goes home with the money. So the agents really know that there is money in this house, and Cahoon even testifies to that. Before he even, any of them, approached the house, he was made aware that there was money in the house. And there's also a drug deal going on. So we have these observations of Ford going to sell drugs to Rose, two kilograms of cocaine. He meets with another car. There's something that looks like an exchange, but it's true. We don't exactly know it. And then he goes directly to the house. So before they even get there, they know that there's cocaine and they know that there's money. And in fact, the observation of the money, not only did they know that, but they didn't observe cocaine. But of course we know that they want a search warrant to get cocaine. That decision to get a search warrant was made after these observations when they had this unforeseen but fortuitous observations which showed there's going to be a drug deal in Rose's house. Now it's true, before that, they hadn't been able to get a search warrant for Rose's house because they didn't have the information. This was the golden opportunity. And in fact- Are all of these facts preceding the observation through the window? Are you marshaling these facts in support of a determination that the independent source doctrine was supported? Or are you making some other argument? Well, I guess they go to both prongs. But they're certainly important as to the independent source, as to when they get the warrant. The problem that I have with the independent source issue is that the one thing the judge said, one way to look at that, it seems as though he misunderstood the independent source doctrine. Whether that's true or not, we don't know that the judge properly applied the independent source doctrine because we don't have that finding of fact on the subjective prong, as Judge Kayada points out. Well, again, I think- The facts might have supported such a determination, but not only was that determination, as far as we know, not made. We don't know that it was made. What was said suggested that the judge might not have even understood the independent source doctrine. And whether the judge did or not, there's no evidence that he applied the- You must be saying that the facts are so clear that the judge got it right. Well, I am saying both, Your Honor, because we have to remember that at the time that the court was considering the independent source doctrine and writing its opinion was based on what the court thought was undisputed facts. Rose said in his memorandum in support of his motion to suppress that legally the evidence should have suppressed. So if it was undisputed facts and what later came out at trial about Cahoon's observations was not before the court, then I think we can infer from what the court said and what the argument had been before it issued its opinion that it was properly applying the independent source doctrine. But even if the court didn't want to go in that direction, I do think the record certainly amply supports the court's finding that the independent source doctrine does apply. But when you say ample, in addition to not having a fact finding by the judge, we don't even have any testimony by Cahoon, do we, that he would have sought a warrant. Right. No, we don't. We don't have. There was no suppression hearing, and the court in its opinion said that the facts are undisputed. And those facts included notes. So you want us to say that the evidence is so strong here that a warrant could have been obtained that we should infer that Queen would have so concluded and that that's what the judge implicitly found and we can therefore affirm. Yes, Your Honor, I do. I think they're separate. One can still find that the district court didn't implicitly find that they would have gotten a warrant based on what was before the judge. And even with that finding, this court can still find, based on all the facts, because the government can rely on the facts at trial to support the court's ruling. I don't think the defendant can rely on the facts at trial because he didn't renew his motion to suppress. But if you look at the whole record, this court can find that Quinn would have gotten the warrant, again, as soon as they made the decision to do this knock and talk. Another piece of the record I think that's important to look at is the search warrant affidavit, sorry, the wiretap affidavit, where Quinn explicitly says in his necessity discussion that we're not going to do search warrants. We've done some searches. We're not going to do search warrants at residences right now, but we anticipate doing them at the end of the investigation. Again, we're going to do it once we know we're going to find the drugs, which fortuitously they're going to find them on November 16th, and therefore it will be okay if it's at the end of the investigation. All of that shows that Quinn is going to get a search warrant. He is simply not going to walk away from the substantial evidence of cocaine, which, again, they didn't see through a window or anything else, knowing certainly with probable cause and more so that there is cocaine in Rose's house. Just one other point, of course, is that Quinn does say in his affidavit nothing that we saw inside the house, which is the money, that's all they saw when they did the initial protective sweep, contributed to me getting the warrant or to probable cause, and certainly this court can conclude from that. By the same token, seeing the money beforehand, in addition, didn't lead him to getting the warrant. As I said, the money is just not that important an observation given everything else that the agents knew. Let me turn, if there are no more questions on the search, let me turn to the Allene claim. We do believe that Fry did not preserve it. As Judge Kayada, we read the transcript in the same way you do, that this was all in the context of a request for a hearing because Fry was contending that the evidence was not reliable and wanted a hearing so the court could determine the reliability of the evidence. He doesn't say anything about Sixth Amendment. The case that he cites has to do with having a hearing to determine reliability of disputed quantities, so we don't believe that that claim is preserved. We also believe, given that this is a plain error standard of review, that neither defendant, and I'll focus on Fry to begin with, has shown a reasonable probability or substantial probability that the sentence would have been different if the court hadn't made a mistake, if it hadn't erred by assuming there was a mandatory minimum. We certainly concede that there was a lean error, but then you have to look at how did the court arrive at its sentence. And in Fry's case, after first saying, yes, there's a mandatory minimum. I just want to make sure I understand this. Let's assume that it was preserved for the sake of argument. Then you would be in harmless error? Correct. So when you say substantial probability, you're still on the plain error? I'm on the third prong of the plain error test. I think it's a reasonable probability is the test for prejudice. I misspoke. So in this case, of course, the defendants, and Fry has to show prejudice, has to show that there's a reasonable probability that he would have gotten a lower sentence. And we don't believe there's anything in the record that would support that. The district court emphasized how serious this drug offense was, the vastness of it, the seriousness of the criminal history, the fact that there were guns involved in this conspiracy. It all went to guidelines determinations for drug quantity and then the 3553A factors. There was no mention of this 20% bump up. And, in fact, as to the career offender, what the court said is, I'm not applying it. It certainly applies. I'm not going to use that. But, in fact, in this case, it only aggravates the sentence a little bit. In most cases, I find it's basically way out of whack. Not so in this case, maybe just a little bit. And, if anything, what the court was looking at at its starting point, and it says this in the beginning of sentencing, is Rose's sentence. Rose got 300 months, and so the court said to Fry, tell me why you should get a different sentence. But there was an express reference to the mandatory minimum. Yes, and that's why there's a lean error. So what do we do with that, though? Well, the court then has to determine whether Fry has established prejudice. It's not enough that there was error and that it was plain, which we concede. Now assume that the issue was preserved and that we're in harmless error territory. What's your argument then? It's the same test, but it's the government's burden. So the government would have to show that the sentence, that the defendant would have gotten the same sentence. And can you? I believe we can, I think for the same reason. There was simply no, after making the error by saying a mandatory minimum applies, I think the context of the entire sentencing shows that that had no effect on where within the entire sentencing range the sentence should end up. The sentence was 300 months, as I said, based on the seriousness of the offense, the guidelines calculations, Rose's sentence. Is any part of your argument based on a Harkley-type assertion that the evidence was overwhelming, that it was way above the amount for a mandatory minimum? Yes, we do make that argument as well. I think in the Alleen context, there are really two different ways one can establish harmlessness or prejudice, depending on whose burden it is. Here, we have to, I think a jury evidence really did overwhelmingly establish that the five kilograms, such that the jury would have found it. We have the two kilograms seized from Rose's house, which applied to both of them. Even if for some reason the court found that it was illegal as to Rose, it certainly applies to Frye. We have at least two kilograms of cocaine that both Pena and Graham testify about. Now, it's true, as we say in our brief, that's not corroborated by other, those specific transactions aren't corroborated by other evidence. But their testimony is corroborated in so many other ways that I believe that certainly that could be credited as well. And we also know from the intercepted phone calls that Frye was a big-time cocaine dealer. Just on the November 16th conversations alone, he's in there for a kilogram, talking about the price wasn't as high the last time. This is a man who certainly dealt five kilograms or more of cocaine over this two-year period. Counsel, I apologize for doing this, but I'd like to take you back to the search warrant. I've gotten so lost in the weeds about the search warrant itself, I have now forgotten whether you have made an argument that what was observed and seized in the house as a result of the search in any event doesn't matter, that the evidence is overwhelming without that. We do make a harmless error argument, Your Honor. And I think that's true. I mean, this is, they're only charged, only, they're charged with conspiracy. The conversations alone show that there was a drug deal involving two kilograms, and then there is all the other testimony from the conversations. These wiretap interceptions show overwhelmingly that both defendants, but certainly as to Rose, since he's the person we're focusing on now, was guilty of a conspiracy. Did you argue the case in closing in that way, or was there mention in the closing of the fruits of the warrantless search? No, it certainly was used at closing because, again, at that point, because Rose didn't renew his motion to suppress, the evidence came in and there wasn't a question about it at that time. But we know trial counsel felt it was significant enough to warrant mentioning in closing. Well, certainly. I mean, it is drugs, but that doesn't necessarily mean that the error is not harmless. Let me just briefly turn to the overview testimony. Agent Quinn's testimony, both identifying the voices and interpreting some drug-related terms, is not overview testimony in the way that this court has used it. Agent Quinn was testifying about his own personal interpretations of these terms. He was doing it based on his knowledge, not what other people told him. In fact, he said that explicitly in two different points in his testimony. At one point he says, these are my interpretations that's not based on what Pena told me, and I believe it was perhaps in his redirect he also said, these interpretations are not based on what the accomplices told me. What about the two examples that the trial counsel cited to us, where the argument, as I understand it, is not that it's interpreting jargon, but it's just pointing to some language and then giving other information by way of overview? Well, one was the megabucks, and that was a term used in the intercepted conversation, and he was interpreting it as a lay opinion case agent who is very familiar with this investigation about what he thought it meant. I don't recall what the second example was, but similarly, that's what his testimony, whatever the term was, that's what his testimony was. The fact that it was not based on what Pena told him is not only shown by the fact that he said, it's not based on what Pena told me, but also if you look at the affidavits for the wiretaps, he makes similar interpretations of the coded language to the issuing judge because he cites many of these same intercepted conversations. So it's clearly based on what he knows about this investigation based on his knowledge. If there are no other questions, we'll rest on our brief. Thank you. Drake? Thank you, Your Honor. As the court has touched on, we have no factual finding on the subjective prong of Murray, and the government's response to that is that it's just obvious that the case agent would have sought a warrant. The best evidence of the case agent's state of mind are his own words, and in paragraph 66 of the search warrant affidavit, Quinn specifically says that he had concerns about searching Rose's residence until the events on November 16th. Now the government has the burden on this, and that statement is at best ambiguous, which is reason for this court to remand the case to the district court for a factual finding. As for harmless error, the evidence in this case was certainly not overwhelming, and it is frankly ludicrous to suggest that the presence of $75,000 and two kilograms of cocaine in Rose's bathroom vanity did not factor prominently in the jury's decision-making. What about his own voice on the wiretaps? Isn't that pretty overwhelming, makes clear that the government got the right guy for the right crime? The wiretaps depend entirely on Quinn's interpretation of them, which is then reiterated by highly motivated drug-addled cooperators, who the jury could easily have discounted. In fact, the government discounts most of the testimony from its star cooperator, Graham. What was he talking about? I mean, I've read those... What was he talking about? He makes a variety of different accusations about Rose's participation in the conspiracy. He talks about four or five times that he's delivered... No, no, I mean what was Rose talking about on the wiretaps, if it wasn't his drug business? We simply don't know without Quinn's overview testimony, and without the testimony from the cooperators. But again, I think that it goes back to the notion that the government relied, in its closing arguments, entirely on the two kilograms of cocaine, which is the subject of the suppression motion, in asking the jury to return a verdict of guilty. The next best evidence that they have against Rose is this good-for-bad exchange of cocaine. Although, again, it depends on the jury's assessment of Graham's credibility. And Graham testified that he never looked at what was in the package, and in fact has a history of delivering stuff in the package that is not, in fact, drugs. Quick point about preservation. I would encourage this court to look at transcript pages 195-197 of the sixth volume, where Rose very clearly renews his motion to suppress. And then lastly, on Aileen, and this touches on some of the discussion about, is the court starting at the minimum or maximum? I would encourage this court to consider, if I may just finish the thought, all of the multidisciplinary research on choice theory, which suggests that the bounds that a court considers are important to its ultimate decision-making. Thank you. Thank you. We'll take a short briefness.